**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel.: (914) 874-0710
Fax: (914) 206 3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SHAWN MILLER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BETTER HOME & FINANCE HOLDING COMPANY,

Defendant.

Case 3:25-cv-07893-EMC

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Shawn Miller ("Plaintiff") brings this class action complaint individually and on behalf of all others similarly situated (the "Class Members") against Defendant Better Home & Finance Holding Company ("Defendant" or "Better Mortgage"). Plaintiff's allegations are based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

**NATURE OF THE ACTION**

1. This is a class action lawsuit brought on behalf of all Better Mortgage users who accessed and applied for a financial product on www.better.com (the "Website"), a website owned and operated by Defendant.

2. Through its Website, Defendant provides financial products where consumers can apply for mortgages, loans, and insurance quotes and be connected to real estate agents and attorneys, title and closing services, and other financial professionals. In order to apply, consumers must share personally identifying information ("PII") and other sensitive financial information, including the specific loans they are applying for, their home address, and credit scores. When consumers provide this information and navigate their private financial accounts, they expect that this confidential information and activity will be protected and not disclosed to unknown third parties. Such expectations are based, in part, on the legal protections afforded to such information.

3. Despite reasonable expectations of privacy, and Defendant's legal and ethical duties to prevent the disclosure of such private information, Defendant discloses information related to consumers' financial applications to LinkedIn Corporation ("LinkedIn") and Google, LLC ("Google"). These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA") and Cal. Fin. Code § 4050, et seq. (the "California Financial Information Privacy Act" or "CalFIPA").

4. Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq*. ("ECPA") and invaded Plaintiff's and Class Members' privacy by disclosing Plaintiff's and Class Members' private and confidential information without consent.

## PARTIES

5. Plaintiff Shawn Miller is a resident and citizen of San Francisco, California. At all relevant times, Plaintiff accessed the Website in California and applied for a home loan. During the application process, Defendant required Plaintiff to share his PII and financial information, including his home address and credit score. Plaintiff created his account and applied for his loan with Better Mortgage on the Website using his Gmail account in or around January to February of 2024.

6. During the time Plaintiff used the Website, he maintained active accounts with LinkedIn and Google. When creating his LinkedIn and Google accounts, Plaintiff provided certain personally identifying information to LinkedIn and Google, including his full name. Plaintiff accessed the Website and applied for a loan with Better Mortgage using the same device and browser used to access his Gmail and LinkedIn accounts. Unbeknownst to Plaintiff, Defendant disclosed his personally identifiable information ("PII") to LinkedIn and Google—including communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA and CalFIPA. Neither Defendant nor LinkedIn nor Google procured Plaintiff's prior consent to the sharing of his private and protected information.

7. Defendant Better Home & Finance Holding Company is a Delaware corporation with its principal place of business in New York, New York. Defendant purports to operate a "digital-first homeownership company" and offers "services including mortgage financing, real estate services, title and homeowners' insurance."[1]

8. Defendant chose to embed LinkedIn and Google's tracking technology on the Website, which it owns and maintains.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law

[1] Better Home & Fin. Holding Co., Registration Statement (Form S-3) (June 3, 2025).

claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

10. This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court. Further, the Defendant has at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout California. Additionally, Plaintiff, while in California, applied for a home loan using the Defendant's Website.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and Plaintiff resides in this District.

## FACTUAL BACKGROUND

### I. The Gramm-Leach-Bliley Act and California Financial Information Privacy Act

12. As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

13. Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i) Personally identifiable financial information; and

(ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

14. Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i) A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii) [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A) Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

(B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C) The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

(D) Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E) Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F) Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

15. Pursuant to 16 C.F.R. § 313.3(k)(1):

> A financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

16. Pursuant to 16 C.F.R. § 313.3(k)(1), Better Mortgage is a financial institution.

17. In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford

persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

18. Cal. Fin. Code § 4052(a) provides that:

> "Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

19. According to Cal. Fin. Code § 4052(b):

> "Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:
>
> (1) Information a consumer provides to a financial institution on an application to obtain a loan, credit card, or other financial product or service.
>
> (2) Account balance information, payment history, overdraft history, and credit or debit card purchase information.
>
> (3) The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.
>
> (4) Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.
>
> (5) Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.
>
> (6) Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

20. "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

21. Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under both federal and California law. Nonetheless, Defendant disclosed such information to LinkedIn and Google, and neither Defendant, LinkedIn, nor Google procured Plaintiff's and Class Members' consent prior to such interceptions.

22. This pattern of conduct by Defendant flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[2]

## II. Overview of Defendant's Website

23. Defendant owns and operates the Website. Unbeknownst to consumers, Defendant integrated the LinkedIn Insight Tag, Google Analytics, and DoubleClick wiretaps (collectively "Tracking Technologies") into the Website.

24. On the Website users can, *inter alia*, search for and browse financial services, open a Better Mortgage account, and use Defendant's online financial services (*i.e.*, apply for a mortgage or HELOC loan, refinance a mortgage, and apply for a life insurance quote). When doing so, Website users provide Defendant with confidential information, including "nonpublic personal information" under the GLBA and CalFIPA, such as their PII (*e.g.* physical address, email addresses) and information about their mortgage activity with Defendant (e.g. purpose of a house purchase, the type of property being purchased, credit score).

25. Unbeknownst to Plaintiff and Class Members, however, Defendant discloses this confidential and protected information to LinkedIn and Google through their respective wiretaps.

26. Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, confidential communications are not procedurally or automatically generated). Instead, as set out below,

[2] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

**III. The LinkedIn Insight Tag.**

27. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[3] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[4] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[5]

28. According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [6] Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement. To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[7] LinkedIn's "marketing solutions allow advertisers to select specific characteristics

---

[3] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441.

[4] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

[5] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[6] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[7] LINKEDIN, *supra* note 3.

to help them reach their ideal audience. The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[8]

29. As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[9]

30. The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, Predictive Audience, and LinkedIn Audience Network.[10]

31. Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and advertisers, including healthcare providers and insurance companies, to target potential customers.[11]

32. For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[12] According to Broc Munro of Microsoft,

---

[8] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[9] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[10] *See id.*

[11] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests"); LINKEDIN, EXAMPLES OF TRENDING AND BEST-IN-CLASS HEALTHCARE CAMPAIGNS AND CONTENT, p.6, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/lkin-lms-sales-healthcare-campaigns-trending-content-Jan2023.pdf ("BD zeroed in on the end-benefit with a 30 second video introducing their PIVO needle-free blood collection device to potential customers."); LINKEDIN, HEALTHCARE SOCIAL MEDIA STRATEGIES FOR 2023, p.1, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/healthcare-microsite/resources/hc-social-media-trends.pdf (listing "potential customers" as "Common audiences" for insurance sector).

[12] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

"[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[13]

33. In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[14] That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[15]

34. According to LinkedIn, the LinkedIn Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[16] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[17]

35. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[18] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[19] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[20] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of

---

[13] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[14] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings

[15] Dencheva, *supra* note 5.

[16] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[17] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[18] LINKEDIN, *supra* note 9.

[19] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[20] *See id.*

modern web browsers do not prevent LinkedIn from collecting data through its software.[21] Instead, the LinkedIn Insight Tag is shielded with the same privacy exemptions offered to first-party cookies.

36. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

37. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

38. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[22]

39. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[23] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[24]

40. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, which Defendant installed on the Website, LinkedIn is able to target its account holders for advertising.

41. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, LinkedIn expressly warrants the opposite. Similarly, Defendant never receives consent from its customers to share information with LinkedIn.

---

[21] *See id.*

[22] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[23] *See id.*

[24] *See id.*

42. When signing up, a user agrees to the User Agreement.[25] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[26] and the Cookie Policy.[27]

43. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to be transparent about the data we collect about you, how it is used and with whom it is shared."[28]

44. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[29] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[30]

45. However, LinkedIn offers an express representation: "We will only collect and process personal data about you where we have lawful bases."[31]

46. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects.

**IV. The Google Tracking Technologies.**

47. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

---

[25] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[26] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[27] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[28] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[29] *Id.*

[30] *Id.*

[31] *Id.* (emphasis added).

48. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

49. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.
- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.
- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

50. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

51. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

52. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Google Analytics and DoubleClick tracking technology embedded on the Website by Defendant constitutes Source Code.

53. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

54. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

55. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

56. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics

Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

57. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

58. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

59. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

60. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."

61. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or users) is using to access a website. The device information intercepted by Google includes the user's operating system, operating system version, browser, language, and screen resolution.

62. In other words, when interacting with the Website, an HTTP Request is sent to Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the user and Source Code, including Google's tracking technologies.

63. Thus, Defendant is essentially handing its users a tapped device, and once the Webpage is loaded onto the users' browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for the Defendant and transmits those communications to Google.

64. Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google database and cannot be changed.

65. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (*e.g.*, information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (*e.g.*, measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (*e.g.*, classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

66. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

67. The Website utilizes Google's pixel and SDK. As a result, Google intercepted users' interactions on the Website, including their PII. Google received at least "Custom Events" and URLs that disclosed the financial services received by the user. Google also received additional PII, including but not limited to the users' IP address, device information, and User-IDs.

68. For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.

69. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

70. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked, and can provide a wide variety of data.

71. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."

72. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques. Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

73. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.

74. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

75. As enabled by Defendant, Google collects vast quantities of consumer data through its tracking technology.

76. Due to the vast network of consumer information held by Google, matches the IP addresses, device information, User-IDs, and partial phone numbers and email addresses it intercepts and links such information to an individual's specific identity.

77. Google then utilizes such information for its own purposes, such as targeted advertising.

78. Google Analytics also links with Google Ads, allowing the data intercepted through Google Analytics to be utilized for targeted advertising purposes.[32] Such practices were in effect on the Website for targeted advertising purposes.

**V. Defendant's Use of Tracking Technologies.**

79. Pursuant to agreements with LinkedIn and Google, Defendant voluntarily embedded the Tracking Technologies on the Website. Through the Tracking Technologies, Defendant unlawfully intercepted and disclosed protected and confidential information to LinkedIn and Google without its customers' consent.

80. Defendant understands that the information handled on the Website is protected by state and federal law. Unfortunately, Defendant does not comply with its obligations to protect such information from unauthorized disclosure.

81. Consumers can start their pre-approval process upon entering Defendant's Website.

**Figure 2:**




[32] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article

82. Once on the Website, Defendant immediately begins tracking and disclosing consumers' interactions with the Website, including during the loan application process.

**<u>Figures 3 and 4:</u>**



```
▾ Request Payload    View source
▾ {pids: [4586026], scriptVersion: 230, time: 1750375910846, domain: "better.com",…}
  ▾ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "A",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      imageAlt: null
      imageSrc: null
      innerText: "Start my pre-approval"
      tagName: "A"
    domain: "better.com"
  ▸ elementCrumbsTree: [{tagName: "div", nthChild: 0, id: "__next"},…]
    hem: null
    href: "/start"
    innerElements: null
    isFilteredByClient: false
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▸ misc: {psbState: -4}
    pageTitle: "Simple, Online, AI-Powered Mortgage | Better Mortgage"
  ▸ pids: [4586026]
    scriptVersion: 230
    signalType: "CLICK"
    time: 1750375910846
    url: "https://better.com/"
    websiteSignalRequestId: "7c439a71-e244-4cc1-a977-72799efa78d2"
```


**(Information intercepted through the LinkedIn Insight Tag)**



**Figure 5:**

Query String Parameters | View source | View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-VY61G49LPS |
| gtm | 45je56g1h2v880909804za200zb71805219 |
| _p | 1750376041523 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~103351869~103351871~104684208~104684211~104718208~104791498~104791500 |
| cid | 411414.1749496602 |
| ul | en-us |
| sr | 2560x1440 |
| ir | 1 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;137.0.7151.104\|Chromium;137.0.7151.104\|Not%2FA)Brand;24.0.0.0 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 15.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| _eu | EAAACAQ |
| _s | 2 |
| dl | https://better.com/preapproval/1a8dbf18-3a36-4bfb-b0f1-1db3cf1354a7/nxt-heloc-intro |
| dt | Home Equity Line of Credit - Better Mortgage - Better Mortgage |
| dr | https://better.com/preapproval/nxt-heloc?utm_source=better-com |
| uid | 9577704 |
| sid | 1750375841 |
| sct | 8 |
| seg | 1 |
| en | page_view |
| _ee | 1 |
| _et | 1623 |
| tfd | 10127 |

**(Information intercepted through Google Analytics)**

**Figure 6:**

Request Payload | View source


```
▾ {pids: [4586026], scriptVersion: 230, time: 1750376158356, domain: "better.com",…}
    domain: "better.com"
    hem: null
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▸ misc: {psbState: -4}
    pageTitle: "Home Equity Line of Credit - Better Mortgage - Better Mortgage"
  ▸ pids: [4586026]
    scriptVersion: 230
    signalType: "PAGE_VISIT"
    time: 1750376158356
    url: "https://better.com/preapproval/7d66ced1-bf75-4351-ac***-***-****fc2d29c/nxt-heloc-intro"
    websiteSignalRequestId: "29a68a4c-daff-07ca-751a-6196cb7445e2"
```


**(Information intercepted through the LinkedIn Insight Tag)**

**Figure 7:**




**Figure 8:**


Request Payload View source
{pids: [4586026], scriptVersion: 230, time: 1750376218158, domain: "better.com",…}
domAttributes: {elementSemanticType: null, elementValue: null, elementType: "button", tagName: "BUTTO
backgroundImageSrc: null
cursor: "default"
elementSemanticType: null
elementTitle: "50 SW 10th St, Miami, FL 33130"
elementType: "button"
elementValue: null
formAction: null
imageAlt: null
imageSrc: null
innerText: "50 SW 10th St, Miami, FL *****"
isFormSubmission: false
tagName: "BUTTON"
domain: "better.com"
elementCrumbsTree: [{tagName: "div", nthChild: 0, id: "__next", attributes: {data-reactroot: ""}},…]
hem: null
href: ""
innerElements: null
isFilteredByClient: false
isLinkedInApp: false
isTranslated: false
liFatId: ""
liGiant: ""
misc: {psbState: -4}
pageTitle: "Home Equity Line of Credit - Better Mortgage - Better Mortgage"
pids: [4586026]
scriptVersion: 230
signalType: "CLICK"
time: 1750376218158
url: "https://better.com/preapproval/7d66ced1-bf75-4351-ac***-***-****fc2d29c/nxt-subject-property-addr
websiteSignalRequestId: "b9c6f037-a12c-48aa-5a38-863797957086"

**(Information intercepted through the LinkedIn Insight Tag)**

**<u>Figure 9:</u>**




**<u>Figure 10:</u>**


```
▾ Request Payload   View source
▾ {pids: [4586026], scriptVersion: 230, time: 1750376317260, domain: "better.com",…}
  ▾ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      formAction: null
      imageAlt: null
      imageSrc: null
      innerText: "It's an investment property"
      isFormSubmission: false
      tagName: "BUTTON"
    domain: "better.com"
  ▸ elementCrumbsTree: [{tagName: "div", nthChild: 0, id: "__next", attributes: {data-reactroot: ""}},…]
    hem: null
    href: ""
  ▸ innerElements: [{elementSemanticType: "IMAGE", elementValue: null, elementType: null, tagName: "svg",…]
    isFilteredByClient: false
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▸ misc: {psbState: -4}
    pageTitle: "Home Equity Line of Credit - Better Mortgage - Better Mortgage"
  ▸ pids: [4586026]
    scriptVersion: 230
    signalType: "CLICK"
    time: 1750376317260
    url: "https://better.com/preapproval/7d66ced1-bf75-4351-ac***-***-****fc2d29c/nxt-subject-property-usag
    websiteSignalRequestId: "064048fd-facf-b090-ab1e-534967591b7b"
```


**(Information intercepted through the LinkedIn Insight Tag)**

**Figure 11:**




**Figure 12:**


```
▾ Request Payload   View source
▾ {pids: [4586026], scriptVersion: 230, time: 1750376428102, domain: "better.com",…}
  ▾ domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "BUTTON",…}
      backgroundImageSrc: null
      cursor: "pointer"
      elementSemanticType: null
      elementTitle: null
      elementType: null
      elementValue: null
      formAction: null
      imageAlt: null
      imageSrc: null
      innerText: "Condo"
      isFormSubmission: false
      tagName: "BUTTON"
    domain: "better.com"
  ▸ elementCrumbsTree: [{tagName: "div", nthChild: 0, id: "__next", attributes: {data-reactroot: ""}},…]
    hem: null
    href: ""
  ▸ innerElements: [{elementSemanticType: "IMAGE", elementValue: null, elementType: null, tagName: "svg",…]
    isFilteredByClient: false
    isLinkedInApp: false
    isTranslated: false
    liFatId: ""
    liGiant: ""
  ▸ misc: {psbState: -4}
    pageTitle: "Home Equity Line of Credit - Better Mortgage - Better Mortgage"
  ▸ pids: [4586026]
    scriptVersion: 230
    signalType: "CLICK"
    time: 1750376428102
    url: "https://better.com/preapproval/7d66ced1-bf75-4351-ac***-***-****fc2d29c/nxt-subject-property-type"
    websiteSignalRequestId: "12ff8b88-8c2c-be1d-1b80-3b7cf9f042e8"
```


**(Information intercepted through the LinkedIn Insight Tag)**

**Figure 13:**




**Figure 14:**




```
{pids: [4586026], scriptVersion: 230, time: 1750376598101, domain: "better.com",…}
  domAttributes: {elementSemanticType: null, elementValue: null, elementType: null, tagName: "BUTTON",…}
    backgroundImageSrc: null
    cursor: "pointer"
    elementSemanticType: null
    elementTitle: null
    elementType: null
    elementValue: null
    formAction: null
    imageAlt: null
    imageSrc: null
    innerText: "700 - 719"
    isFormSubmission: false
    tagName: "BUTTON"
  domain: "better.com"
  elementCrumbsTree: [{tagName: "div", nthChild: 0, id: "__next", attributes: {data-reactroot: ""}},…]
  hem: null
  href: ""
  innerElements: null
  isFilteredByClient: false
  isLinkedInApp: false
  isTranslated: false
  liFatId: ""
  liGiant: ""
  misc: {psbState: -4}
  pageTitle: "Home Equity Line of Credit - Better Mortgage - Better Mortgage"
  pids: [4586026]
  scriptVersion: 230
  signalType: "CLICK"
  time: 1750376598101
  url: "https://better.com/preapproval/7d66ced1-bf75-4351-ac***-***-****fc2d29c/nxt-borrower-credit-range"
  websiteSignalRequestId: "94e13cdf-c2aa-2e19-14e0-d0e092d35006"
```


**(Information intercepted through the LinkedIn Insight Tag)**

83. Defendant also discloses whether an applicant has been approved or denied for one of its financial products.

**<u>Figure 15</u>**:

<table>
<tr><td>random</td><td>1750085870062</td></tr>
<tr><td>cv</td><td>11</td></tr>
<tr><td>fst</td><td>1750085870062</td></tr>
<tr><td>fmt</td><td>3</td></tr>
<tr><td>bg</td><td>ffffff</td></tr>
<tr><td>guid</td><td>ON</td></tr>
<tr><td>async</td><td>1</td></tr>
<tr><td>gcl_ctr</td><td>38</td></tr>
<tr><td>gtm</td><td>45je56b1h1v880909804z871805219za200zb9219489895</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>tag_exp</td><td>101509157~103116026~103200004~103233427~103351869~103351871~104617979~104617981~104661466~104661468~104684204~104684207~104718208~104736445~104736447</td></tr>
<tr><td>u_w</td><td>2560</td></tr>
<tr><td>u_h</td><td>1440</td></tr>
<tr><td>url</td><td>https://neohomeloans.com/preapproval/132f48d9-428b-48a7-994b-98fd230ac5a2/nxt-approved</td></tr>
<tr><td>ref</td><td>https://neohomeloans.com/customer-verify/fingerprint?preapprovalUuid=132f48d9-428b-48a7-994b-98fd230ac5a2&borrowerType=borrower</td></tr>
<tr><td>label</td><td>pNGMCIuD3agDEKaVsMAD</td></tr>
<tr><td>hn</td><td>www.googleadservices.com</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>tiba</td><td>Get a mortgage preapproval - NEO Home Loans</td></tr>
<tr><td>value</td><td>0</td></tr>
<tr><td>userId</td><td>9584368</td></tr>
<tr><td>ga_uid</td><td>G-VY61G49LPS.9584368</td></tr>
<tr><td>bttype</td><td>purchase</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>auid</td><td>956389460.1750085449</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Google%20Chrome;137.0.7151.103|Chromium;137.0.7151.103|Not%2FA)Brand;24.0.0.0</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>ec_mode</td><td>a</td></tr>
<tr><td>fledge</td><td>1</td></tr>
<tr><td>capi</td><td>1</td></tr>
<tr><td>_tu</td><td>Sg</td></tr>
<tr><td>em</td><td>tv.1</td></tr>
<tr><td>ct_cookie_present</td><td>0</td></tr>
</table>

**(Information intercepted through Google Ads)**[33]

84. Defendant shares its applicants' PII and financial information (specifically, the applicant's address, property information, loan application type, and credit score) with its advertising partners, including LinkedIn and Google. The information shared by Defendant allows LinkedIn and Google to know the identities of specific individuals as well as information related to the financial services they are receiving. This allows these companies, including Defendant, to profit from this information for targeted advertising purposes.

[33] At the end of the application process, Defendant routes applicants to the Neo Home Loans website, which purports to be "powered by Better [Mortgage]."

85. The information disclosed by Defendant was also accompanied by the lms_ads and li_sugr cookies, whereby LinkedIn could connect the disclosed PII and financial information with the applicant's LinkedIn profile.

86. In other words, and as shown above, Plaintiff's communications with Defendant were disclosed by Defendant to LinkedIn and Google and/or intercepted in transit by LinkedIn and Google, in real time, via detailed URLs and event data, which contain the nonpublic personal information and personally identifiable information entered into the Website.

87. Defendant sent also disclosed identifiers (cid, IP address, and device information) with each applicant's "event" data.

88. Such event data includes the fact that a user is seeking financial services (i.e. approval for a loan), as shown above.

89. When users share their personal information with financial services, they expect this information to be kept confidential. Moreover, when consumers seek a specific service from financial websites, they also expect this highly sensitive information to be kept confidential.

90. Through the above-listed LinkedIn Insight Tag, DoubleClick, and Google Analytic tracking services, which Defendant used via the software codes installed, integrated and embedded into the Website, Defendant disclosed its applicants' legally protected information.

91. Defendant engages in this deceptive conduct for its own profit at the expense of their consumers' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and are in violation of federal and state law.

**VI. Tolling of Claims**

92. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies into its Website.

93. The Tracking Technologies were and are entirely invisible to a website visitor.

94. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

95. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

96. Defendant had exclusive knowledge that its Website incorporated the Tracking Technologies and yet failed to disclose to consumers, including Plaintiff and Class Members, that by accessing financial services through the Website—including mortgages, loans, and insurance quotes—Plaintiff's and Class Members' private and confidential facts and information relating to their applications would be disclosed or released to LinkedIn and Google.

97. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of consumers sensitive and personal information. Accordingly, Defendant is estopped from relying on any statute of limitations.

98. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

99. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the original complaint in this matter.

## CLASS ACTION ALLEGATIONS

100. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Class:** All natural persons in the United States with LinkedIn and/or Google accounts who, during the class period, accessed the Website and applied for one of Defendant's financial products through https://www.better.com.
>
> **California Subclass:** All natural persons in the State of California with LinkedIn and/or Google accounts who, during the class period, accessed the Website and applied for one of Defendant's financial products through https://www.better.com.

101. Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

102. The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly

execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

103. **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's records and the records of LinkedIn and Google.

104. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class Member, include, but are not limited to, the following: whether Defendant violated the ECPA, the CIPA §§ 631 and 632, and whether Plaintiff and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

105. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other Class Members, visited the Website and had his confidential electronic communications intercepted and disclosed to LinkedIn and Google through the Tracking Technologies.

106. **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

107. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I

**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511, *et seq.***

108. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

109. Plaintiff brings this claim on behalf of himself and members of the Class.

110. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

111. The ECPA protects both sending and receipt of communications.

112. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

113. The transmission of Plaintiff's PII and financial information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

114. The transmission of PII and financial information between Plaintiff and Class members and Defendant's Website with which they chose to exchange communications are

"transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

115. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

116. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

117. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

118. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant, LinkedIn, and Google used to track Plaintiff's and Class members' communications while they were navigating the Website;

b. Plaintiff's and Class members' browsers;

c. Plaintiff's and Class members' mobile devices;

d. Defendant's and LinkedIn's web and ad servers;

e. Defendant's and Google's web and ad servers;

f. The plan that Defendant and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website; and

g. The plan that Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

119. Plaintiff and Class members' interactions with Defendant's Website are electronic communications under the ECPA.

120. By utilizing and embedding the tracking technologies provided by LinkedIn and Google on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

121. Specifically, Defendant intercepted—in real time—Plaintiff's and Class members' electronic communications via the tracking technologies provided by LinkedIn and Google on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class members' PII and financial information to LinkedIn and Google.

122. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding PII, including their identities and information related to their financial services. This confidential information is then monetized for targeted advertising purposes, among other things.

123. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to LinkedIn and Google through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

124. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

125. Defendant intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

126. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the

United States or of any State. Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party. GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[34]

127. Plaintiff's information that Defendant disclosed to LinkedIn and Google qualifies as nonpublic personal information (including his loan application, address, property information, and credit score), and Defendant violated Plaintiff's and Class members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant specifically used the tracking technology provided by LinkedIn and Google to track and utilize Plaintiff's and Class members' PII for financial gain.

128. Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

129. Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy. Plaintiff and Class members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to LinkedIn and Google without their knowledge or consent.

130. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

131. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

---

[34] 16 C.F.R. § 313

**<u>COUNT IV</u>**

**Invasion of Privacy Under California's Constitution**

132. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

133. Plaintiff brings this claim on behalf of himself and members of the California Subclass against Defendant.

134. The highly sensitive and personal information of Plaintiff and California Subclass members consists of private and confidential facts and information regarding Plaintiff's and California Subclass members' financial services that were never intended to be shared beyond private communications on the Website and the consideration of finance professionals.

135. Plaintiff and California Subclass members had a legitimate expectation of privacy regarding their PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third party, such as LinkedIn and Google.

136. Defendant owed a duty to Plaintiff and California Subclass members to keep their PII and financial information confidential.

137. Defendant's unauthorized disclosure of Plaintiff's and California Subclass members' PII and financial information to LinkedIn and Google, two of the world's largest technology and marketing companies, is highly offensive to a reasonable person.

138. Defendant's willful and intentional disclosure of Plaintiff's and California Subclass members' PII and financial information constitutes an intentional interference with Plaintiff's and California Subclass members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

139. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and California Subclass members' privacy because Defendant facilitated LinkedIn's and Google's simultaneous eavesdropping and wiretapping of confidential communications.

140. Defendant failed to protect Plaintiff's and California Subclass members' PII and financial information and acted knowingly when they installed the tracking technology onto the

Website because the purpose of said technology is to track and disseminate users' communications on the Website for marketing and advertising.

141. Because Defendant intentionally and willfully incorporated the tracking technology onto the Website and encouraged individuals to use and interact with the Website and the services thereon, Defendant had notice and knew that this practice would cause injury to Plaintiff and the California Subclass.

142. As a proximate result of Defendant's acts and omissions, the PII and financial information of Plaintiff and California Subclass members was disclosed to LinkedIn and Google, causing Plaintiff and the California Subclass to suffer damages.

143. Plaintiff, on behalf of himself and California Subclass members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, lost benefit of the bargain and pre-judgment interest and costs.

144. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the California Subclass since their PII and financial information is still maintained by Defendant and is still in the possession of LinkedIn and Google, and the wrongful disclosure of this information cannot be undone.

145. Plaintiff and California Subclass members have no adequate remedy at law for the injuries relating to Defendant's and unauthorized third party's continued possession of their sensitive and confidential information. A judgment for monetary damages will not undo Defendant's disclosure of the information to unauthorized third party who, upon information and belief, continue to possess and utilize the information.

146. Plaintiff, on behalf of himself and California Subclass members, further seeks injunctive relief to enjoin Defendant from intruding into the privacy and confidentiality of Plaintiff's and California Subclass members' PII and financial information and to adhere to its common law, contractual, statutory and regulatory duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein

(c) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d) For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded

(f) For an order of restitution and all other forms of equitable monetary relief

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees, expenses, and costs of suit.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: May 14, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *<u>/s/ Philip L. Fraietta</u>*

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel.: (914) 874-0710
Fax: (914) 206 3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*